UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NANCY J. SHERMAN,

                        Plaintiff,

     – against –

TOWN OF CHESTER, TOWN BOARD OF THE
TOWN OF CHESTER, and PLANNING BOARD
OF THE TOWN OF CHESTER,

                    Defendants.

**OPINION AND ORDER**

12 Civ. 647 (ER)

Ramos, D.J.:

      This matter comes before the Court once again on the motion of Laroe Estates, Inc.

("Laroe") to intervene in this litigation between Nancy J. Sherman, the widow of Bill Sherman

("Sherman"),[1] and Defendants the Town of Chester, the Town Board of the Town of Chester,

and the Planning Board of the Town of Chester (collectively, "the Town"). The Court initially

denied Laroe's motion on the basis that it lacked standing to bring a claim for damages against

the Town. *See Sherman v. Town of Chester* ("*Sherman II*"), No. 12 Civ. 647 (ER), 2015 WL

1473430, at *14–16 (S.D.N.Y. Mar. 31, 2015). The Second Circuit vacated and remanded the

Court's decision. *See Laroe Estates, Inc. v. Town of Chester*, 828 F.3d 60 (2d Cir. 2016). The

Supreme Court, in turn, vacated and remanded the Second Circuit's decision. *See Town of

Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645 (2017). After the Second Circuit remanded

the case to this Court for further proceedings in accordance with the Supreme Court's opinion,

*see* 693 F. App'x 69 (2d Cir. 2017), the parties engaged in limited discovery on the relationship

---

[1] Mr. Sherman passed away in October 2013. His widow, Nancy J. Sherman, has replaced him as the Plaintiff. For
conformity with past decisions, this Court refers to Plaintiff by using masculine pronouns.

between Laroe and Sherman and submitted extensive supplementary briefing. *See* Docs. 75, 82, 87, 90–93. For the following reasons, the Court GRANTS in part and DENIES in part Laroe's motion.

## I.    FACTUAL BACKGROUND

Sherman was a real estate developer who in 2001 purchased a 398-acre tract of land in Chester, New York, known as "MareBrook." Compl. (Doc. 1 Ex. A) ¶¶ 5, 39, 353. The MareBrook project was to include 385 residential housing units, a golf course, an equestrian facility, baseball fields, tennis courts, a clubhouse, and a restaurant. *Id.* ¶ 10. Sherman claims that over the course of the ensuing ten years, the Town wrongfully prevented him from developing MareBrook because it variously wanted: (1) to make MareBrook a "*de facto* nature preserve," *id.* at ¶¶ 21, 30, 285, 299; (2) to retaliate against him for instituting several lawsuits against the Town over the development of MareBrook, *id.* at ¶¶ 26–29, 61, 225, 231, 241, 262; and (3) to discriminate against him because he is Jewish, one of his business associates is Jewish, and Town residents are worried about MareBrook becoming a Hasidic community, *id.* ¶¶ 31–32, 222, 225, 307–24, 326.[2]

The dispute currently before the Court revolves around the relationship between Sherman, the MareBrook property, and Laroe. Laroe and its principals are real estate developers, and in 2003, Laroe entered into an agreement with Sherman, ostensibly for the purchase of lots on three parcels of land in the MareBrook property. *See* Proposed Intervenor's Complaint (Doc. 83-1) ¶ 20.

The June 2003 agreement between Sherman and Laroe provided that:

> [Sherman] agrees to sell and convey to [Laroe] and [Laroe] agrees
> to purchase and acquire from [Sherman] the single-family home

---

[2] The background of this case is set forth in greater detail in this Court's March 2013 Order. *See Sherman v. Town of Chester*, No. 12 Civ. 647 (ER), 2013 WL 1148922 (S.D.N.Y. Mar. 20, 2013).

> building sites or lots created by either a subdivision or site plan
> which are to be located on three parcels of land currently owned by
> Sherman designated on the tax maps of the Town of Chester, New
> York as Section 15, Block 1, Lots 9.2 and 65.1 and that portion of
> tax lot Section 8, Block 1, Lot 20 located east and south of Bull Mill
> Road, all as more particularly described and depicted on Exhibit A
> hereto, together with any and all of the rights and appurtenances
> pertaining to such Property . . . .

*See* Affirmation of Joseph Haspel ("Haspel Aff.") (Doc. 74) Ex. K. at 188. In the event that the Town approved fewer than 135 lots for the subdivision, either party could terminate the agreement. *Id.* In the event that the approvals were not completed in the time frame contemplated by the contract, Laroe had the right to terminate the agreement. *Id.* at 197–98. Similarly, in the event of a taking of the property by eminent domain, Laroe could elect to terminate; if it did not, it and Sherman would "be deemed to have elected to proceed with Closing, in which event [Sherman would] assign to [Laroe] all of [Sherman's] right, title, and interest in and to any and all claims and proceeds [Sherman] may have with respect to any condemnation awards or insurance proceeds." *Id.* at 203.

Between 2003 and 2004, Laroe paid Sherman $2.5 million in three collateral notes secured by mortgages on the MareBrook property.[3] *Id.*; *see also* Declaration of Alexander J. Eleftherakis ("Eleftherakis Decl.") (Doc. 86) Exs. B–D. The first note, for the sum of $1 million, was payable on June 30, 2006, "if the principal sum is repaid to the Mortgagee upon or as the result of the cancellation of the contract of sale." *Id.* Ex. B.

---

[3] Because the property is described differently in the 2003 agreement and the mortgage notes, the Court is unclear as to whether Laroe's mortgage was against the entire MareBrook property, not just the parcels Laroe contemplated purchasing outright. Nevertheless, this does not affect the Court's decision in this case.

In 2010, Laroe sued Sherman to recover $1.5 million plus interest, representing the amount owing on two of the three mortgage notes. *Id.* Ex. G. [4] Laroe explained that it had sent Sherman written notices of default, and ten days later, had sent written demand for payment due under the mortgages within sixty days. *Id.* Sherman, however, failed to pay Laroe. *Id.* Sherman moved to dismiss or stay the complaint arguing that, as Orthodox Jews, he and Laroe's owner, Joseph Hershkowitz, were obligated to adjudicate their dispute before a rabbinical court. *Id.* Ex. H.

On April 25, 2012, the rabbinical court ruled that "[b]eing that Mr. Steven Sherman failed to pay [Laroe] the amount of $2,500,000, therefore, as of today, the aforementioned properties belong to [Laroe]." Haspel Aff. Ex. F. This decision was memorialized in a May 7, 2013 amendment to the June 2003 agreement. Under the amendment, the purchase price of the agreement became: (1) the $2.5 million Laroe already advanced to Sherman; (2) any amount paid to TD Bank to satisfy the mortgages, (3) the transfer of certain lots in the development back to Sherman after approval, and (4) the execution of a related consulting agreement between the parties. *Id.* Ex. K at 233. With respect to TD Bank, the agreement provided that "[s]ettlement of the amounts due under the TD Mortgages shall be in the sole discretion of [Laroe]. In the event the TD Bank Mortgages are not settled prior to any foreclosure sale of the property, [Laroe] may terminate this agreement, with no further liability between [Laroe] and [Sherman]." *Id.* at 234. Although the settlement amount was discretionary, settlement was also a prerequisite to the

---

[4] With respect to the third mortgage note, Laroe had already attempted to foreclose on the mortgage by filing a cross-claim in a foreclosure action brought by TD Bank, who held a superior mortgage. *See id.* Exs. H–I. Laroe subsequently sought an indefinite stay of the foreclosure sale on that property, which was denied. *See id.* Ex. K. In its affirmation informing the court of the sale, counsel for TD Bank wrote that "it is stunning that following 5 ½ years of dilatory litigation tactics, neither LaRoe Estates, Inc. or their legal counsel Joseph J. Haspel, Esq., cared to appear for the foreclosure auction . . . . Respectfully, LaRoe Estates, Inc.'s complete abdication of interest in the foreclosure auctions . . . after so much senseless litigation to obstruct those actions speaks volumes to this Court regarding their actual interest in bidding upon, paying money for and ultimately owning the mortgage property." *Id.*

closing of the agreement: "As a condition of the Closing under the Agreement, [Laroe] shall procure the following: (a) the TD Bank Settlement referenced in Section 2 of this Amendment, and (b) the release of all TD Bank Mortgages encumbering the properties . . . ." *Id.* In other words, Laroe could elect to proceed with the closing and the transfer of the properties by settling with TD Bank; if not, Laroe could elect to terminate the agreement with Sherman.

## II. PROCEDURAL HISTORY

Although discovery has not yet begun, this case has already had a long and tortured history. Sherman first filed suit in federal court on May 5, 2008. *See Sherman v. Town of Chester et al.*, No. 08 Civ. 4248 ("*Sherman I*") (S.D.N.Y. 2008). In that lawsuit, as in the instant one, he alleged a federal takings claim. Sherman voluntarily dismissed that action on January 6, 2012, in response to the Town's argument that the takings claim was unripe because Sherman had not alleged that he sought and was denied just compensation by an available state procedure. *See Sherman v. Town of Chester*, 752 F.3d 554, 563–64 (2d Cir. 2014). He then re-filed his federal takings claim and his state law claims for compensation in Supreme Court, Orange County on January 12, 2012. It was that subsequently filed lawsuit that the Town removed to this Court on January 26, 2012. *See* Doc. 1.

In early 2013, the Court granted the Town's motion to dismiss on the grounds that Sherman's constitutional takings claim was unripe. *See Sherman v. Town of Chester*, No. 12 Civ. 647 (ER), 2013 WL 1148922 (S.D.N.Y. Mar. 30, 2013). The Second Circuit reversed, finding that Sherman had stated a non-categorical taking. *Sherman*, 752 F.3d at 566. In reaching that conclusion, the Circuit found that the Town's actions "effectively prevented Sherman from making any economic use of his property," interfered with his reasonable investment-backed expectations, and "singled out [his] development, suffocating him with red tape to make sure he

could never succeed in developing MareBrook." *Id.* at 565. The Second Circuit remanded the case for further consideration of Sherman's other claims. *Id.* at 567.

Within days of the Second Circuit's decision, Laroe wrote a letter to the Court, asserting, for the first time, that it "is a contract vendee of Plaintiff with respect to the subject real property, as well as the holder of an arbitration award giving it the right of ownership." Doc. 16. Laroe moved to intervene in the lawsuit and the Town moved to dismiss the remainder of Sherman's claims against it. On March 31, 2015, the Court dismissed Sherman's procedural and substantive due process claims, his equal protection claim, and his state claims. *See Sherman II*, 2015 WL 1473430. The Court also denied Laroe's motion to intervene, concluding that "courts in this Circuit have found that contract vendees lack standing to assert a takings claim" and that "Laroe has not provided any reason to depart from the reasoning [of those cases]." *Id.* at *15–16. Therefore, the Court found that Laroe did not have standing to bring a takings claim "based on its status as contract vendee to the property." *Id.*[5]

The Second Circuit reversed, finding that the Court should not have denied the motion "based on [Laroe's] failure to show it had Article III standing," because independent standing was not required on a motion to intervene. *Laroe*, 828 F.3d at 65. Although the Second Circuit found that "the factual record . . . is insufficiently developed at this stage to allow us confidently to resolve these arguments," it suggested that Laroe had valid arguments on the Rule 24(a) requirements. *Id.* at 66–70.

The Supreme Court disagreed, holding: "[A]n intervenor of right must have Article III standing in order to pursue relief that is different from that which is sought by a party with standing. That includes cases in which both the plaintiff and the intervenor seek separate money

---

[5] Although the Court did not address the Rule 24(a) factors, it cast doubt on Laroe's ability to meet the timeliness requirement. *Id.* at *16 n.20.

judgments in their own names. . . . If Laroe wants only a money judgment of its own running directly against the Town, then it seeks damages different from those sought by Sherman and must establish its own Article III standing in order to intervene." *Town of Chester*, 137 S. Ct. at 1651–52. The Supreme Court remanded the case because Laroe's arguments had been inconsistent and ambiguous with respect to the damages it sought. *Id.*

Laroe has filed a Proposed Intervenor Complaint in which it raises two causes of action. First, Laroe alleges a regulatory taking of Plaintiffs' real property and seeks an award of damages in Sherman's name or in both Sherman and Laroe's names. *See* Doc. 83-1 ¶¶ 130–39, 142(a). Second, Laroe alleges that, as the equitable owner of the MareBrook property, the alleged regulatory taking damaged him directly and he seeks an award of compensation for the taking of his interest in the property. *Id.* ¶¶ 140–41, 142(b).

## III.  INDEPENDENT STANDING

### A.  Disavowal

As a preliminary matter, the Town argues that Laroe may no longer assert a claim for damages in its own right because it disavowed that position at the Second Circuit and Supreme Court. Memorandum of Law in Opposition to Laroe's Motion for Intervention ("Chester Mem.") (Doc. 87), at 12. "Statements made by an attorney during oral argument . . . constitute binding judicial omissions." *General Ins. Co. of Am. v. Mezzacappa Bros., Inc.*, No. 01 Civ. 7394 (FB), 2003 WL 22244964, at *5 (E.D.N.Y. Oct. 1, 2003) *aff'd* 110 F. App'x 183 (2d Cir. 2004). Laroe argues that it has never disavowed its position that it could make a claim for damages in its own name, and that its attorney's statements at oral argument were "based solely upon the state of the facts as they existed after this Court's initial ruling on Laroe's intervention

motion"—in other words, counsel's statements assumed that Laroe had no standing.[6]  *See* Reply

Supplemental Memorandum of Law in Support of Laroe's Motion for Intervention ("Laroe

Reply Mem.") (Doc. 90), at 8.

The Court agrees with Laroe that it did not foreclose the possibility of filing an amended

complaint seeking damages in its own right.  In fact, although Laroe was not entirely clear on the

damages it was seeking during the appellate review process, at one point in the Supreme Court

oral argument, Laroe seemed to clarify that while it was at that point arguing that it did not need

standing to intervene based on its then-existing complaint, it might bring a claim for damages in

its own name at a later stage, which would require it to establish standing.  *See* Affirmation of

Joseph Haspel in Support of Laroe's Motion to Intervene (Doc. 74) Ex. I (Transcript of April 17,

---

[6] In a colloquy with Justice Gorsuch, Mr. Dvoretzky seemed to disclaim any request for damages in Laroe's name:

> JUSTICE GORSUCH: Your client, page 162, wants damages for itself. . . .  Seems to me like that is a different form of relief, isn't it?

> MR. DVORETZKY: Justice Gorsuch, the way in which this case has been litigated, and trial counsel conceded this in the Second Circuit, I'll represent it to you here today, we are not seeking separate relief—only in our name.

> JUSTICE GORSUCH: Well, except for the complaint expressly says that.

> MR. DVORETZKY: The—the complaint says that, but oftentimes the complaint says one thing and over the course of the litigation the theories might develop differently.  And the—the way in which we are at this point seeking relief here is relief to recover for Sherman.  We will at a later date need to figure out how we'll get that money from him, and we would either need to potentially settle that claim or have standing to bring our own claim in Federal court or in State court to get the money from him.  But the reason . . .

> JUSTICE GORSUCH: So you're disclaiming the relief sought in your complaint.

> MR. DVORETZKY: We are disclaiming—

> JUSTICE GORSUCH: Is there any relief you're seeking at this stage?

> MR. DVORETZKY: The relief that we are seeking is to maximize Sherman's recovery because we have a stake in that recovery . . . .

*See* Tr. at 43:6–44:1.

2017 oral argument ("Tr.")) at 47:20–24 ("If we ourselves came in at a later date, filed and amended pleading and said now we are seeking additional damages in our own name. Then, at that point, an Article III inquiry would be required."). Further, counsel for the Town agreed that the scope of the Supreme Court's inquiry should rest on the assumption that Laroe did not have standing, *see* Tr. at 18:6–9, and the Supreme Court acknowledged that the record was "ambiguous" with respect to Laroe's requested relief. 137 S. Ct. at 1652 n.4. Unlike *United States Trust Company of New York v. Shapiro*, the case to which Chester cites for support, Laroe's counsel's statements did not constitute an "unequivocal concession" and were not the basis for the Supreme Court's ensuing opinion. *See* 835 F.2d 1007, 1008 (2d Cir. 1987). Therefore, the Court finds that Laroe is not precluded from seeking to assert a claim for damages in its own name or from attempting to persuade the Court, for the second time, that it has standing to seek damages in its own name.

### B.     Equitable Title

Laroe argues that it has standing to assert its own claim for damages against the Town because it held equitable title to the MareBrook property. *See* Memorandum of Law in Support of Laroe's Motion for Intervention ("Laroe Mem.") (Doc. 75), at 16. The Town argues that Laroe did not hold equitable title to the MareBook property, *see* Chester Mem. at 14–18, and that even if it did, Laroe's status would be insufficient to confer standing, *id.* at 19–27.

### 1.     Laroe's Status Under the 2003 Agreement

As a preliminary matter, the parties dispute whether, by virtue of the 2003 agreement, Laroe was a contract vendee or merely a mortgagee of the MareBrook property. *See* Chester Mem. at 14–15; Laroe Reply Mem. at 5–6. "The execution of a contract for the purchase of real estate and the making of a partial payment gives the contract vendee equitable title to the

9

property." *Carnavalla v. Ferraro*, 722 N.Y.S.2d 47, 48 (2d Dep't 2001) (citing *Polish Nat'l Alliance of Brooklyn, U.S.A. v. White Eagle Hall Co.*, 470 N.Y.S.2d 642, 647 (2d Dep't 1983)). By contrast, a mortgage "creates no estate in the land, but is merely a lien on the mortgaged premises." *Smith v. Andre*, 43 A.D.3d 770, 772 (2d Dep't 2007). Laroe argues that the fact that the 2003 agreement defines Sherman as the "Seller" and Laroe as the "Purchaser" evinces Laroe's intent "of taking title, thereby merging the money paid into the deed." Laroe Reply Mem. at 5. The Town argues that because Laroe's payment took the form of a note secured by the MareBrook property, the transaction was essentially a mortgage transaction. Chester Mem. at 14.

Under New York law, "a mere label . . . will not mask a transaction which is a *de facto* mortgage." Blumenthal, Supplementary Practice Commentaries, N.Y. Real Prop. L. § 320 (2016). Thus, "where a deed is given as security, it becomes a mortgage by operation of law." *DeMaio v. Capozello*, 74 A.D.3d 864, 865 (2d Dep't 2010) (quoting *Corcillo v. Martut, Inc.*, 58 A.D.2d 617, 618 (2d Dep't 1977) *aff'd* 45 N.Y.2d 878 (1978)). "In determining whether a deed was intended as security, examination may be made not only of the deed and a written agreement executed at the same time, but also of oral testimony bearing on the intent of the parties and to a consideration of the surrounding circumstances and acts of the parties." *Patmos Fifth Real Estate Inc. v. Mazl Bldg., LLC*, 140 A.D.3d 527, 528 (1st Dep't 2016) (quoting *Bouffard v. Befese, LLC*, 111 A.D.3d 866, 868 (2d Dep't 2013)).

Here, the Court finds that the 2003 agreement and the associated payments operated to make Laroe a mortgagee of the MareBrook property. Equitable title only vests when there is both an "execution of a contract for the purchase of real estate" and "a partial payment." *Carnavalla*, 722 N.Y.S.2d at 48. Based on the evidence now before the Court, the $2.5 million

Laroe paid Sherman in 2003 and 2004 were loans secured by the property—in other words, mortgages—rather than payments on the contract. The notes are called "collateral note and mortgage," and each states:

> The Mortgagor promises to pay the Mortgagee or order the sum of [the value of the note] on the 30th day of June, 2006, together with interest thereon at the rate of 10% per year from the date thereof, if the principal sum is repaid to the Mortgagee upon or as the result of the cancellation of the contract of sale (the "Contract") hereinafter referred to in the annexed RIDER hereto unless cancellation is as the consequence of the default of the Mortgagee under the Contract, in which case no interest shall be charged. If the principal sum is credited to the Mortgagee against the purchase price under the Contract at a title closing pursuant thereto, no interest will be charged.

Eleftherakis Decl. Exs. B–D. If Sherman defaulted under the 2003 agreement or it was otherwise cancelled, Laroe was entitled to recover its money plus interest. If Laroe defaulted under the 2003 agreement, it was still entitled to recover its money. If Laroe and Sherman actually closed the property and set a purchase price, Laroe was entitled to credit its money against the purchase price. Laroe's status after 2003 was therefore closer to that of a lender rather than a contract vendee; although the parties anticipated and contracted for the possibility of a real estate transaction in the event of subdivision approval, in the interim, the essence of the agreement was that Laroe would lend Sherman $2.5 million secured by a mortgage. Subsequently, Laroe attempted to foreclose on one of the mortgages and sued Sherman to recover the money it paid on the other two mortgages. *Id.* Exs. G–I. Laroe's actions in attempting to recover on the mortgages in 2009 and 2010 evince an intent to treat the 2003 agreement and related payments as conferring a mortgage, rather than equitable title. Thus, the

Court finds that Laroe has no standing to sue as equitable owner of the MareBrook property based on the 2003 agreement.[7]

### 2.    Laroe's Status Under the 2013 Amendment

Following Laroe's attempts to recover its investments and foreclose on the mortgage notes, it entered arbitration with Sherman under a *Beth Din*, a rabbinical court of Judaism, and the parties amended the contract in 2013.  Under the 2013 amendment, the purchase price of the property became:  (1) the $2.5 million Laroe already paid to Sherman; (2) any amount paid to TD bank to satisfy the mortgages, (3) the transfer of certain lots in the development back to Sherman after approval, and (4) the execution of a related consulting agreement between the parties.  *See* Haspel Aff. Ex. K at 233.  Further, Laroe could elect to proceed with closing and the transfer of the properties by settling with TD Bank; if not, it could elect to terminate the agreement with Sherman.  *Id.* at 234.

The Town argues that because the 2013 amendment "only conferred rights to Laroe if it satisfied a number of conditions," Sherman did not convey equitable title to Laroe by virtue of the amended agreement.  Chester Mem. at 19.[8]  Laroe argues that the condition—here, Laroe's settlement with TD Bank—was for its benefit and therefore could be waived.  Laroe Mem. at 28

---

[7] The Court is aware that the Second Circuit, in dicta, took a different view of the 2003 agreement.  *Laroe*, 828 F.3d at 68 n.3 ("It is true that Sherman provided a mortgage as security for the $2.5 million Laroe paid him, but structuring the transaction in that way does not necessarily convert the purchase agreement into a loan. At the end of the day, Laroe did not want to be paid <u>back</u>—it wanted the property.").  At that stage of the litigation, the Second Circuit was aware of the 2003 agreement and 2013 amendments, but was not aware of Laroe's actions in 2010 seeking for its $2.5 million to be "paid back."  The Court therefore respectfully concludes based on the more fully developed record—namely, the evidence suggesting that Laroe's intent was to treat the 2003 agreement as conveying a mortgage in the MareBrook Property and contracting for the possibility of purchasing property from Sherman after subdivision approval—supports the determination that Laroe was not made a contract vendee by virtue of the 2003 agreement.

[8] The Second Circuit's opinion took the view that the 2013 amendment gave Laroe a vested interest in the MareBrook properties because it "vested Laroe with 'the sole discretion' to settle the TD Bank mortgages," and "[s]o long as Laroe transferred the required number of lots back to Sherman after the Town approved the subdivision, the 2013 amendment deemed the purchase price 'paid in full.'"  *Laroe*, 828 F.3d at 68 n.3.  The Second Circuit, however, did not decide whether the 2013 amendment gave Laroe equitable title to the MareBrook property.

(citing *Laxrand Const. Corp. v. R.S.C.A. Realty Corp.*, 135 A.D.2d 685 (2d Dep't 1987)). It is true that when the condition in the contract is "intended for the sole benefit" of the purchaser, he is "therefore entitled to waive it" and to proceed under the contract. *Suburban Hous. Dev. & Research v. Island Props. & Equities*, 6 A.D.3d 423, 424 (2d Dep't 2004). However, "while conditions relating to subdivision approval in a real estate contract are usually for the benefit of the purchaser," where the seller also retains certain lots after the contemplated transaction, approval is "for the benefit of the sellers as well" and cannot be waived unless "both parties agreed . . . or unless there was a waiver by conduct." *Poquott Dev. Corp. v. Johnson*, 104 A.D.2d 442, 443 (2d Dep't 1984). Here, the settlement with TD Bank was a condition to the closing that would have benefited both Laroe and Sherman; therefore, it could not be waived by Laroe alone.[9] In reply, Laroe continues to rely on *Laxrand*, *see* Laroe Reply Mem. at 3, but that case's holding rested on the fact that there was "nothing in the record to indicate that the provision was inserted for the benefit of the defendant seller as well." *Laxrand*, 135 A.D.2d at 685. Therefore, the Court finds that since Laroe could not waive the condition and did not settle the TD Bank mortgages, it never became the equitable title holder of the MareBrook property.[10]

---

[9] The 2013 amendment required "the transfer to Seller, within 60 days after receipt of the 'Approval' . . . of a number of Lots . . . equal to one lot for each ten lots in excess of approved Lots over 227." *See* Haspel Aff. Ex. K at 233. Therefore, even under the 2013 amendment, Sherman was to retain lots in the contemplated subdivision, and settlement of the foreclosure proceedings involving the Property would have inured to its benefit as well as Laroe's. Bizarrely, Laroe argues that the Town is incorrect in asserting that under either agreement, Laroe contracted to purchase only some of contemplated lots. Laroe Reply Mem. at 4. Laroe does not explain why this contention, clearly supported by the contracts themselves, is incorrect.

[10] The Court also notes that the 2013 amendment requires Laroe's settlement with TD Bank as a condition of closing, but does not require Laroe to settle. *See* Haspel Aff. Ex. K at 234 ("Settlement of the amounts due under the TD Mortgages shall be in the sole discretion of Purchasers. In the event the TD Bank Mortgages are not settled prior to any foreclosure sale of the Property, Purchaser may terminate this agreement, with no further liability between Purchaser and Seller."). The amendment may therefore be better characterized as an option agreement. *See Rottkamp v. Eger*, 346 N.Y.S.2d 120, 126 (N.Y. Sup. Ct. 1973) ("An option is distinguishable from a contract to sell by reference to the buyer's obligations. Under a contract to sell the purchase has not only the right to purchase, but is obligated to do so, whereas in an option, the seller alone is obligated, and the purchaser may or may not buy at his own will.").

### 3. Whether Equitable Title Confers Standing for a Takings Claim

Finally, the Town argues that even if Laroe were a contract vendee and had equitable ownership of the Property, that is still insufficient to confer standing under the Second Circuit's decision in *United States Olympic Committee v. Intelicense Corp., S.A.* Chester Mem. at 19–26. The Court addressed this issue in its 2015 opinion on standing:

> The Second Circuit has held that "[o]nly the owner of an interest in property at the time of the alleged taking has standing to assert that a taking has occurred." Accordingly, courts in this Circuit have found that contract vendees lack standing to assert a takings claim. For example, in *R & V Development, LLC v. Town of Islip*, No. 05 Civ. 5033 (DRH), 2007 WL 14334, at *1 (E.D.N.Y. Jan. 3, 2007), the plaintiff alleged that he was a vendee to a contract for the purchase of a parcel of real property in Islip, New York, and that the town zoning board had denied his application for a variance for single-family housing on the property. The court relied on *USOC* to dismiss the takings claim on the basis of the plaintiff's status as contract vendee rather than property owner at the time of the alleged taking. Similarly in *Gebman v. New York*, No. 07 Civ. 1226 (GLS), 2008 WL 2433693, at *1 (N.D.N.Y. June 12, 2008), the plaintiff alleged various injuries from a corporation's sale of real property to the City of Beacon. There, "ownership [was] not in dispute" because plaintiff, by his own admission, was "a contract vendee holding interest in the development of parcels . . . downstream." The court observed that while the defendant had not cited any authority for the proposition that only an owner of property may assert a takings claim, that proposition appeared to be a correct statement of law based on the Second Circuit's holding in *USOC*. The court therefore concluded that the plaintiff lacked standing as a contract vendee to assert a takings claim and dismissed the cause of action.
>
> Laroe has not provided any reason to depart from the reasoning of *R & V Development* and *Gebman*. First, even if Laroe had equitable title in the property based on the execution of his agreement with Sherman in 2003, such status would have established a legal relationship between Laroe and Sherman, but not between Laroe and Defendants. Second, Laroe repeatedly acknowledges in his proposed complaint and papers that he was a contract vendee at the time of the alleged taking. Accordingly, based on the Second Circuit's clear guidance in *USOC*, Laroe does not have standing to bring a takings claim based on its status as contract vendee to the property.

*See Sherman*, 2015 WL 1473430, at *15–16 (internal citations and footnotes omitted). Neither the Second Circuit nor the Supreme Court has spoken on this issue, and Laroe has made substantially the same arguments regarding *USOC*, *R&V Development*, and *Gelman* that it did three years ago. Laroe still argues that courts in this Circuit have "improperly extended" the Second Circuit's holding in *USOC* that "only the owner of an interest in property at the time of the alleged taking has standing to assert that a taking has occurred." Laroe Mem. at 20 (quoting *USOC*, 737 F.2d 263, 267–68 (2d Cir. 1984)). Neither Laroe nor the Town point to new cases or present new arguments in support of their positions regarding the impact of *USOC* on the instant dispute.[11] For this reason as well, the Court maintains its 2015 decision that Laroe does not have standing and therefore cannot bring a takings claim against the Town in its own name. The Court therefore DENIES Laroe's motion to intervene with respect to its second cause of action.

## IV.    RULE 24(A) REQUIREMENTS

Even if Laroe does not have standing to bring his own claim against the Town, if it meets the requirements of Rule 24(a), it is entitled to intervene as a matter of right on its first cause of action, which seeks only to join Sherman's takings claim.[12]

"For intervention as of right under Rule 24(a)(2), the moving party must show: (1) the application is timely; (2) the applicant has a significant protectable interest relating to the

---

[11] Laroe cites to several cases to support its contention that "New York law provides that the vendor holds the legal title in trust for the vendee," Laroe Mem. at 22, and argues that *Kendle v. Town of Amsterdam*, in which the Third Department determined that equitable title does not create privity between an equitable title holder and third parties, is inapposite, *id.* at 24–25. The Court disagrees with Laroe's reading of *Kendle*. Even if, as Laroe argues, the risk of loss provision in the 2003 agreement differed from the default risk of loss rule at issue in *Kendle*, that does not support Laroe's argument that equitable title gave it standing to sue the Town directly: *Kendle* plainly provides that equitable title governs the relationship between the vendee and the vendor, not the vendee and third parties. *See Kendle*, 36 A.D.3d 985, 986 (3d Dep't 2007). Laroe, further, has put forward no cases in support of its argument that a contract vendee is able to sue a third party based on its equitable title to the subject property.

[12] While the Proposed Intervenor Complaint is not a model of clarity, the Court understands that the first cause of action does not seek damages to be awarded to Laroe, but rather seeks a single award of damages to both Laroe and Sherman which would later be divided between the two parties.

property or transaction that is the subject of the action; (3) the disposition of the action may practically impair the applicant's ability to protect its interest; and (4) the existing parties may not adequately represent the applicant's interest." *Kamdem-Ouaffo v. Pepsico, Inc.*, 314 F.R.D. 130, 134 (S.D.N.Y. 2016). A putative intervenor's failure to satisfy any one of these requirements is dispositive of his motion. *See Farmland Dairies v. Comm'r of N.Y.S. Dep't of Agric. & Markets*, 847 F.2d 1038, 1043 (2d Cir. 1988).

### A.    Timeliness

As the Court stated in its 2015 opinion, "the timeliness of an intervention motion is a matter left to the district court's discretion." *Sherman II*, 2015 WL 1473430, at * 16 n.20. "In determining whether a motion to intervene is timely, courts consider (1) how long the applicant had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness." *Laroe*, 828 F.3d at 66–67 (quoting *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 70 (2d Cir. 1994)).

Although this Court expressed skepticism about the timeliness of Laroe's motion in *Sherman II*, it did not decide the issue. *Sherman II*, 2015 WL 1473430, at *16 n.20. On appeal, the Second Circuit also considered the timeliness of Laroe's motion without deciding the issue. *See Laroe*, 828 F.3d at 67. The Second Circuit concluded that although Laroe failed to explain why it did not try to intervene before this Court's 2013 motion to dismiss decision and "could have moved to intervene sooner," the litigation was "still at an early stage" and "the parties ha[d] not even begun discovery." *Id.* The Second Circuit therefore rejected the notion that Laroe had attempted "to join [the] lawsuit at the eleventh hour." *Id.*

The Town raises largely the same arguments about Laroe's timeliness as it did before the Court in *Sherman II*. *See* Chester Mem. at 33.[13] However, the Town also raises the issue of Laroe's conduct during the pendency of the intervention motion—specifically, Laroe's failure to comply with the Town's discovery requests for over a year, and the fact that "Laroe's flip-flopping theories has caused significant delays in the disposition of a lawsuit in which it has not [sic] rightful place." *Id.* Laroe does not address the impact of its behavior during the intervention motion itself in its reply. The Court agrees with the Town that Laroe's tactics have delayed the disposition of the motion and may have been dilatory. However, the timeliness requirement of Rule 24(a) asks the Court to consider a party's timeliness in filing a motion to intervene, not its timeliness in prosecuting that motion. Although this evidence can be considered by the Court as "unusual circumstances militating . . . against a finding of timeliness," the Court finds that where, as here, the Town has not pointed to prejudice from Laroe's conduct and the Second Circuit has suggested that Laroe's motion should not be construed as an attempt to intervene at the eleventh hour, Laroe has met the timeliness requirement of Rule 24(a), though only barely.

## B.    Interest Relating to the Property

Rule 24(a) also requires that the putative intervenor show a "direct, substantial, and legally protectable" interest "relating to the property or transaction that is subject of the action." *Laroe*, 828 F.3d at 68 (quoting *Wash. Elec. Coop., Inc. v. Mass. Mun. Wholesale Elec. Co.*, 922 F.2d 92, 97 (2d Cir. 1990) and *MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n*, 471 F.3d 377, 385 (2d Cir. 2006)). Here, the Town argues that because Laroe must have had an interest relating to

---

[13] The Town also raises a statute of limitations argument with respect to Laroe's claim for damages in its own name. *See* Chester Mem. at 32–33. Because the Court has rejected that claim, it does not address the parties' statute of limitations arguments.

the property at the time of the taking, Laroe's attempts to terminate the 2003 agreement foreclose any arguments that it had an interest relating to the property. Chester Mem. at 28–29. The Town also argues that Laroe's interest is "far too remote" to satisfy Rule 24. *Id.*

The Court disagrees. Neither party disputes that under the 2003 agreement, in the event of a taking, if Laroe did not elect to terminate the agreement, "then [Sherman] and [Laroe] shall be deemed to have elected to proceed with Closing, in which event [Sherman] shall assign to [Laroe] all of [Sherman's] right, title, and interest in and to any and all claims and proceeds [Sherman] may have with respect to any condemnation awards or insurance proceeds relating to the Property." *See* Haspel Aff. Ex. K at 203. Here, while Laroe asserted in 2010 that it had terminated the agreement and sought a judicial award in accordance with that position, at some point during or after the parties' arbitration, Laroe elected instead to maintain its interest in the MareBrook property through the 2013 amendment. Therefore, throughout the period in which the alleged taking occurred, Laroe had an interest in any condemnation award Sherman would receive based on the risk of loss provision in the 2003 agreement. The Court finds that Laroe's interest in Sherman's possible recovery against the Town is a direct, substantial, and legally protectable interest even though Laroe had no power to recover against the Town in his own name. Therefore, the Court finds that Laroe has satisfied the requirements of Rule 24(a)(2) as well. *See Laroe*, 828 F.3d at 69 (noting that Laroe's interest need not be "a vested interest in the property that would permit it to bring a takings claim against the Town in a separate action" for this requirement to be met).

### C.    Laroe's Ability to Protect Its Interests and Sherman's Representation

The third and fourth requirements of Rule 24(a) seek to ensure that intervention is necessary because without it, the putative intervenor will be "impair[ed]" or "imped[ed]" in

protecting his interest, and that his interest is not "adequately represented by the other parties" already. *Laroe*, 828 F.3d at 70. The Town argues that Sherman already adequately represents Laroe because the two are "allied in interest." Chester Mem. at 29 (citing Declaration of Michael Diederich ("Diederich Decl.") (Doc. 82)). "While the burden to demonstrate inadequacy of representation is generally speaking 'minimal,' we have demanded a more rigorous showing of inadequacy in cases where the putative intervenor and a named party have the same ultimate objective." *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 179 (2d Cir. 2001) (internal citations omitted). In those instances, there is a presumption of adequate representation by the party already in the action that must be rebutted. *Id.* at 179–80.

Laroe argues that its interests are not adequately represented because the question of how damages will be "allocated between Sherman and Laroe creates a conflict" between them. Laroe Mem. at 40. Laroe does not explain why the ultimate allocation of damages rebuts the presumption that Sherman's interest, like Laroe's, is to maximize recovery from the Town. Instead, Laroe merely states "the Court need to only ponder the question of the effect of a settlement between Sherman and [the Town]." Laroe Reply Mem. at 14. The Court does not believe Sherman's ability to settle this litigation would necessarily create a conflict between Laroe and Sherman, and Laroe cites to no authority for its proposition.

However, in support of Laroe's motion, counsel for Sherman has filed a declaration informing the Court that the Sherman Estate "is a plaintiff with very limited funds for litigation" and "will be strained to adequately fund this litigation and its need for expert witnesses and discovery." Diederich Decl. ¶¶ 18–19. "[A]n existing party's proven lack of financial resources to continue litigation may signify inadequate representation." *Butler, Fitzgerald & Potter*, 250 F.3d at 181 (denying the intervention motion because the putative intervenor had not proved the

current party's inability to litigate the case). Here, based on Sherman's counsel's declaration, the Court finds that Sherman may be unable to adequately represent the Sherman-Laroe interest in maximizing recovery from the Town without Laroe's intervention and assistance. Therefore, for this reason, the Court finds that Laroe's motion meets the requirements of Rule 24(a)(3) and (4) and GRANTS Laroe's motion for mandatory intervention.[14]

## V.    CONCLUSION

For the reasons set forth above, Laroe's motion for intervention is GRANTED in part and DENIED in part. Laroe may join and file the Proposed Intervenor Complaint only insofar as it does not state a claim for damages in Laroe's own name. The parties are directed to appear for a status conference October 3, 2018 at 2:30 p.m. at the United States Courthouse, 40 Foley Square, Courtroom 619, New York, NY 10007.

It is SO ORDERED.

Dated:    September 7, 2018
         New York, New York

Edgardo Ramos, U.S.D.J.

_____

[14] Because the Court grants intervention as of right, it does not consider the parties' arguments with respect to permissive intervention.